# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

CHELSEA OLIVER,
*Plaintiff*

v.

ROEHM AMERICA LLC,
YOLANDA BROWN and
ANDREW STILLUFSEN,
*Defendants*

CIVIL ACTION NO. _____

JUDGE _____

MAG. JUDGE _____

## <u>COMPLAINT AND JURY DEMAND</u>

### I.       INTRODUCTION

1.       Chelsea Oliver was a hardworking employee. She worked at a chemical production facility in Waggaman, Louisiana owned by Roehm America LLC. She stood out to her supervisors, because she was one of the few women on site, and because she was a strong contributor to the workplace. Initially, her contributions were recognized, and she was rewarded for her efforts through merit-based raises and bonuses. Around February 2020, Ms. Oliver developed a disability in her right knee. Around the same time, Defendant Yolanda Brown began working at the Waggaman facility. As a result of her injuries, Ms. Oliver's doctor recommended she undergo two surgeries, which necessitated the use of short-term disability and job protected leave. Once Ms. Oliver began to exercise her rights under federal and state law, and as part of her group health benefits, Defendants began to target her. They passed her over for promotions, accused her of lying about the hours she worked, and terminated her. Since her termination, Defendant Andrew

Stillufsen, General Counsel for Roehm, targeted Ms. Oliver with further retaliation upon learning

of her intent to pursue her claims and filing of her EEOC Charge.  As a result, Ms. Oliver who has

suffered significant emotional and economic harm as a result of Defendants' illegal conduct, files

this suit in order to obtain a remedy for her injuries.

## II.      JURISDICTION AND VENUE

2.      This Court has jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. §

1331 because they arise under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C.

§ 2601 et seq, and the Employee Retirement Income Security Act, ("ERISA") which are federal

statutes.[1]

3.      This Court has jurisdiction over Plaintiff's state law causes of action pursuant to 28

U.S.C. § 1367.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because a substantial

part of the events or omissions giving rise to this claim occurred within Jefferson Parish, which is

located in the Eastern District of Louisiana.

5.      Plaintiff has exhausted all necessary administrative remedies by filing a Charge of

Discrimination with the Equal Employment Opportunity Commission.

## III.     PARTIES

6.      Plaintiff **CHELSEA OLIVER** is an individual of the age of majority and a resident

of St. Tammany Parish, State of Louisiana, who was formerly employed by Roehm America LLC

at the Waggaman location in Westwego, Jefferson Parish, Louisiana.

---

[1] Plaintiff also has claims arising under Title VII and the Americans with Disabilities Act which will be added to this suit once she receives her Notice of Right to Sue from the Equal Employment Opportunity Commission. Since 180 days have not elapsed since she filed her Charge of Discrimination on June 28, 2021, she cannot yet request the Notice of Right to Sue, but will do so once able to.

7.      Defendant **ROEHM AMERICA LLC,** is a foreign corporation headquartered in Parsippany, New Jersey, and registered in Delaware, that is doing business in the State of Louisiana (hereinafter "Roehm") with its principal place of business in Louisiana at 10800 River Road, Westwego, Louisiana, which is a methacrylate production facility. Upon information and belief, until July 31, 2019, Evonik Cyro LLC owned and operated the facility at 10800 River Road, in Westwego, in the State of Louisiana. On August 1, 2019, Evonik Cyro LLC was purchased by a new owner and was separated from all Roehm entities. Also on August 1, 2019, Rohm GmbH became the new owner of the 10800 River Road facility and became the owner of its subsidiary Roehm America LLC. In September 2019, Rohm GmbH, and Roehm America LLC, changed the name of the owner of the 10800 River Road facility from Evonik Cyro LLC to Roehm America LLC. Roehm employed more than 75 individuals at its Westwego location, at all times relevant to this Complaint.

8.      Defendant **ANDREW STULLIFSEN** is General Counsel for Roehm, and is domiciled in Westfield, Union County, in the State of New Jersey.

9.      Defendant **YOLANDA BROWN** is a Human Resources Manager for Roehm and is domiciled in New Orleans, Orleans Parish, State of Louisiana.

## IV.      FACTUAL BACKGROUND

### A.      Ms. Oliver, a hard-working administrative assistant, quickly excelled in her new position.

10.     Ms. Oliver has almost fifteen years of experience as an administrator with a focus on human resources and accounts payable.

11.     She spent seven years working at Our Lady of the Lake Regional Medical Center as the Payroll Clerk and Accounts Payable Clerk. She then built on this experience at several other companies.

3

12.     In 2017, Ms. Oliver interviewed to work at Evonik Cyro LLC, a methacrylate production facility in Westwego, Jefferson Parish, Louisiana.

13.     During her interview, former Human Resources Manager, Mike Wyatt, and former Plant Manager, Michael Rinner, told Ms. Oliver that the company had a tuition reimbursement policy.  Ms. Oliver was particularly interested in that benefit, as she had recently began taking classes to work toward her Associate's Degree at Nicholls State University.

14.     Ms. Oliver was hired by Roehm as an administrative assistant in March 2017. As a woman, she immediately stood out. Just four other women worked at her location.  The remaining employees were all male.

**B.     Evonik Cyro LLC denied Ms. Oliver's requests for promotion, for raises, and for reimbursement for tuition.**

15.     After starting, Ms. Oliver quickly realized her job duties far exceeded the duties listed in her job description.

16.     In September 2017, Ms. Oliver asked Christy Bryan, Interim Human Resources lead, to change her job description to reflect her actual job duties, whether she could receive a raise for performing so many additional job duties, and about her eligibility for tuition reimbursement. Ms. Bryan informed her that these issues could be addressed after she completed one year of employment.

17.     More than a year after her hire, in April 2018, Mr. Rinner informed Ms. Oliver that she was not allowed to apply for the reimbursement. Suddenly, he claimed for the first time that only management-level employees, or employees that were believed to have management potential, could receive the reimbursement.

18.     Not only was this a mischaracterization of the policy, but Ms. Oliver was very successful in her position, and there was no reason why she should not have been considered for a

management role. At the same time, Mr. Rinner also refused to her update her job description or increase her salary.

### C.    Ms. Oliver received raises from Roehm based on her success and yet, was still denied a raise and tuition reimbursement by Roehm.

19.    The company recognized Ms. Oliver's success, through merit-based raises and bonuses. For example, in April 2018, Ms. Oliver received a 1.8% merit increase and a 4% bonus. Then, based on her success in 2018, Ms. Oliver received a 3% merit increase, and a 4% bonus in April 2019.

20.    In July 2019, after yet another request for reimbursement for tuition, and a raise, Shelley Welch, HR Manager, and Scott Griffin, the Plant Manager after Mr. Rinner, informed Ms. Oliver that she was, in fact eligible, for tuition reimbursement and should have been receiving it. However, they denied her raise.

21.    As requested, she submitted the necessary paperwork, and yet, never received any reimbursement.

### D.    Roehm continued the pattern of discriminating against Ms. Oliver, and continued to refuse to give her tuition reimbursement, or a raise.

22.    In August 2019, when ownership changed from Evonik Cyro LLC to Roehm, new managers were hired, and in late 2019 and early 2020, new policies were issued. However, the tuition reimbursement policy stayed the same.

23.    Around November 2019, Ms. Oliver discussed tuition reimbursement with U.S. Manufacturing Director and  interim Plant Manager, Drew Scott.  Mr. Scott was surprised that Ms. Oliver had not received reimbursement, and that Mr. Rinner had denied her request.

24.    Mr. Scott told Ms. Oliver that he was aware that other, male employees were receiving reimbursement.

25.     In January 2020, Ms. Oliver submitted another application for tuition reimbursement via email to Mr. Scott. At the same time, she also asked for a raise.

26.     In February 2020, Ms. Oliver asked Mr. Scott about her outstanding reimbursement request and request for a raise, and he replied that he had not had time to look at the request. In April 2020, Ms. Oliver asked Mr. Scott about the reimbursement and raise request again and received no response. Over two years, Ms. Oliver paid $17,063.56 in tuition that should have been reimbursed.

> **E.      Roehm manager Mr. Scott gave male employees tuition reimbursement, promotions, and raises, but continued to refuse to do the same for Ms. Oliver and other women.**

27.     In contrast, Mr. Scott encouraged male employees, like Brandon Cockrell, who at the time was the Maintenance & I/E Supervisor, to take classes, and promised reimbursement if they did so. When Mr. Cockrell declined the offer, Mr. Scott promoted him and excluded the educational requirement from the position he was promoted to.

28.     Similarly, Mr. Scott encouraged Ronald Brown, who at the time was the Production Resource Lead, to take classes and promised him tuition reimbursement. Mr. Brown declined the reimbursement offer because he did not agree to the terms.  Despite this, he was given a "spot bonus" to cover tuition he had paid.

29.     Despite many requests to management to update her job description and salary to match her job duties, Ms. Oliver never received a raise beyond her annual merit increase, and her position was never re-graded to reflect the level of responsibility she carried. In contrast, men were promoted, even when no positions were available.

30.     For example, Mr. Cockrell's job description and salary were increased three times in 2020 by Mr. Scott. Similarly, in 2019, Mr. Scott created a position for Mr. Brown, Production Resources Group Lead.

31.     In contrast, Ms. Oliver, one of just five women at Roehm repeatedly requested title and salary increases but never received them. Other women also found Roehm to be a hostile work environment. For example, in 2020, a female contractor left because she felt she was subjected to a hostile work environment based on her gender.

32.     On January 30, 2020, Ms. Oliver again reached out to Mr. Scott and again asked that the Company reimburse her tuition as required by policy, and to give her a raise to match her job responsibilities. He did not respond.

**F.     Ms. Oliver requested two weeks of time off pursuant to the FMLA to recovery from surgery for chronic knee pain.**

33.     Around February 2020, Ms. Oliver developed severe pain in her right knee that limited her activities and required frequent use of a knee brace. Because of her constant pain, Ms. Oliver could not stand for long periods, could not walk long distances, climb stairs, or regularly exercise as she had before the onset of the injury. Ms. Oliver's knee pain also limited her ability to participate in activities with her daughter that she had regularly participated in before her injury, such as playing on the playground and at home, swimming, and going on walks along the lakefront.

34.     In early February 2020, Ms. Oliver's physician, Dr. Jason Rolling, conducted a McMurray Test on her right knee, which indicated a meniscal tear in the knee. Dr. Rolling also noted that the injury in Ms. Oliver's right knee caused atrophy in that leg and, subsequently, pain in her left leg, hip, and lower back from compensating for limited use of her right leg. He prescribed her Hydrocodone and physical therapy 2-3 times a week to help with her knee pain.

35.     In February 2020, Yolanda Brown began working onsite as the Human Resources Manager and site manager for the Westwego site where Ms. Oliver worked.

36.     In March 2020, Ms. Oliver requested, and was approved, to take time off for a knee surgery her physician suggested she undergo under the Family Medical Leave Act (FMLA). Ms.

Oliver was instructed to request her FMLA leave through Sedgwick, whom Roehm contracted with to process all leave and disability related requests on Roehm's behalf.

37.     Ms. Oliver requested this job protected leave as an accommodation for her disability, as was her right pursuant to the FMLA. She was out on leave beginning on March 3, 2020, the day she underwent a meniscectomy to fix the chronic knee pain and weakness in her leg. She was out while she recovered from surgery until March 15, 2020.

38.     Ms. Oliver was a recipient of employee group benefits provided by Roehm including health insurance, short-term disability, and long-term disability. Ms. Oliver utilized these benefits for her injuries and disabilities. For example, her knee surgery was covered under her group health insurance policy.

39.     Ms. Oliver also received short-term disability benefits on March 13, 2020.

40.     While on leave, Mr. Scott informed Ms. Oliver that, upon her return, she would work remotely because of the onset of the COVID-19 pandemic.

41.     Further, in his signed Return to Work Evaluation Form submitted to third-party claims administrator Sedgwick, Ms. Oliver's physician, Dr. Jason Rolling, requested that Ms. Oliver be permitted to work from home as she continued to recover from surgery.

42.     Based on Mr. Scott's instructions and her doctor's recommendation, beginning on March 15, 2020, Ms. Oliver worked from home.

**G.     Mr. Scott retaliated against Ms. Oliver as soon as she returned from FMLA leave.**

43.     As soon as she came back from leave, Ms. Oliver was retaliated against. For example, Mr. Scott removed her from all site management team meetings. She had participated in those since she was first hired. Mr. Scott claimed she was removed because she was working remotely, but that meeting was held through Microsoft Teams and other employees participated

8

virtually. Further, Ms. Oliver's doctor noted her need to work remotely in Ms. Oliver's return to work form submitted to Sedgwick on March 13, 2020. These meetings were held monthly. She was also excluded from monthly Plant Team meetings, which all employees attended, and from Fortier Improving Together meetings which were held weekly. Prior to August 2020, Ms. Oliver had attended these routine meetings.

44.     On August 10, 2020, Mike Barreca, then Plant Manager, informed Ms. Oliver that she was not to work any additional overtime and keep a set schedule from 7:30 to 4:00 pm.

45.     Before this date, Ms. Oliver typically worked hundreds of hours of overtime a year. Therefore, this meant that Ms. Oliver would make substantially less than before.

46.     Ms. Oliver expressed her concern over the new limited hours to Mr. Barreca. She explained that she regularly received phone calls, emails, and texts outside of those hours that needed responses.

**H.     Ms. Oliver's disability worsened requiring additional FMLA leave.**

47.     In his signed certification submitted to Sedgwick on March 5, 2020, Dr. Rolling indicated that Ms. Oliver may experience "flare-ups" as a result of the March 2020 surgery that could potentially limit her capacity.

48.     After the surgery, Ms. Oliver did, in fact, continue to experience severe pain in her knee, and could not walk long distances without pain, perform household tasks, use stairs, or exercise.

49.     Because of Ms. Oliver's continuing, severe pain she returned to her physician for additional treatment. Dr. Rolling prescribed an "aggressive strengthening" regimen through continuing physical therapy 2-3 times a week.

50.     On August 8, 2020, Ms. Oliver's medical team determined that the March 2020 surgery had failed, and a second surgery would be needed. The continuing injury was so severe,

that Ms. Oliver's physicians determined she could not safely drive, climb, crawl, or stand for long periods without this second surgery.

51.     On August 12, 2020, Ms. Oliver requested additional FMLA leave and short-term disability due to the increased severity of pain in her knee after the failure of the March 2020 surgery and subsequent second surgery.

**I.     Ms. Oliver was granted two weeks of FMLA leave.**

52.     She was granted FMLA leave beginning on August 18, 2020, and originally requested leave through August 30, 2020.

53.     On August 18, 2020, Ms. Oliver underwent an arthroscopy, debridement, femoral micro-fracturing, and cartilage harvest on her right knee.

54.     Again, Ms. Oliver utilized group health benefits to assist with her injuries and disabilities. For example, her knee surgery was again covered under her group health insurance policy.

55.     Ms. Oliver's physician requested additional leave for Ms. Oliver to run from August 18, 2020 to October 30, 2020. This leave was requested as an accommodation for her disability and as was her right pursuant to the FMLA. This request was approved.

56.     Ms. Oliver received short-term disability benefits from August 28, 2020 through October 9, 2020. After Sedgwick approved Ms. Oliver's request, payments for short-term disability were made by Roehm pursuant to Ms. Oliver's right under their group employee benefits.

**J.     Ms. Oliver was retaliated against by Defendant Yolanda Brown as soon as she was out on her second FMLA leave.**

57.     Immediately after she left on leave, Ms. Brown started building up a case to terminate Ms. Oliver.

58.     As Human Resources Manager, Ms. Brown had the power to hire and fire employees, including Ms. Oliver. She supervised and controlled her work site, oversaw Ms. Oliver's scheduled hours and pay, and kept employment records related to Ms. Oliver. Ms. Brown was also responsible for administering all employment actions, including promotions, transfers, and separations, and ensuring the "fair, equitable, and consistent administration for all corrective actions."

59.     Once on leave, Ms. Brown began investigating Ms. Oliver's hours and timesheets.

**K.     Ms. Oliver required additional FMLA leave to recover from her surgery.**

60.     After the surgery, Ms. Oliver's physicians and physical therapist grew concerned about her recovery and determined an aggressive course of treatment was needed.

61.     Later in August 2020, Ms. Oliver's physician recommended additional FMLA leave to continue until October 2020, to allow Ms. Oliver additional time to recover. On August 27, 2020, Ms. Oliver requested this leave as an accommodation for her disability and as was her right pursuant to the FMLA.

**L.     Ms. Oliver was again denied a promotion and a raise.**

62.     On August 30, 2020, as requested, Ms. Oliver submitted comments as part of her performance review to Mr. Barreca. She complained that although her "role has significantly grown over the course of [my tenure] . . .transforming from basic timekeeping, clerical duties, and general administrative support into the range of responsibilities now carried and supported by this role. Due to the ongoing growth of this role, I have been assured countless times by numerous people (including three previous site HR managers, two previous plant managers, and the manufacturing director) that my position would be reviewed and eligible for a regrade. . . . [I]t is thoroughly disappointing that . . the company has not upheld the expectations in which it provided[.]" Ms. Oliver never received a response.

11

**M.     Ms. Brown and Mr. Stillufsen terminated Ms. Oliver before she even returned from FMLA leave.**

63.     Then, in September 2020, while Ms. Oliver was still on leave, Mr. Barreca posted several open job positions for which Ms. Oliver was qualified on the company's intranet.

64.     However, since Ms. Brown had removed Ms. Oliver's intranet access, she did not know they were posted and could not apply.

65.     One of the positions, Document Control Specialist, was a promotion and was well-tailored to Ms. Oliver's experience and qualifications. After Ms. Oliver was terminated, Mr. Barreca hired a man for that role who had never taken FMLA leave, Stephen Fischer. Ms. Oliver had more experience than Mr. Fischer using the IntellaQuest system necessary for the position.

66.     Then, at the end of September 2020, Ms. Brown and Mr. Barreca informed Roehm staff that they were not to speak to Ms. Oliver for any reason until she was released by her physician to return to work.

67.     While still on FMLA leave, Ms. Oliver was terminated on October 6, 2020. Ms. Brown, Mr. Stillufsen, manager and counsel for Roehm, and Ed Spruck, Corporate Vice President of Human Resources, called Ms. Oliver and informed her she was terminated for "gross misconduct."

68.     Mr. Stillufsen, as a manager of Roehm, and general counsel, had the power to hire and fire employees, including Ms. Oliver, supervised and controlled Ms. Oliver's work schedule, and determined her rate and method of pay, and kept employment records related to Ms. Oliver.

69.     During the October 6, 2020 meeting, Ms. Brown stated that she looked at pictures of Ms. Oliver and her child on Facebook and that they thought she should be at work if she was able to play with her child at home.

70.     In one picture, Ms. Oliver is sitting near her child in her garage, and in another, she is wearing a knee brace while putting at a mini-golf course. Ms. Oliver's surgeon requested leave so she could receive a surgery, and so she could recover from the surgery because during the time she could not safely drive, climb, crawl or stand for long periods of time. Ms. Oliver was not engaging in any of those activities in the pictures used to "justify" her termination on that basis.

71.     In the same meeting, Ms. Brown also claimed Ms. Oliver had "falsified" her request for FMLA and short-term disability pay. Further, Ms. Brown claimed that Ms. Oliver had falsified her overtime hours, and asked her on the spot to verify what she was working on during specific hours on December 19, 2019, and April 2020. Ms. Oliver asked for a chance to look at her notes and emails to determine what she was working on since so much time had passed. Ms. Brown and Mr. Stillufsen refused and claimed Ms. Oliver should be able to remember offhand despite the fact that it was almost a year ago. Mr. Spruck also commented that he found the hours to be "unbelievable" because he, personally, has never worked those hours during his career.

72.     During the meeting, Ms. Brown also stated that they were going to continue to investigate Ms. Oliver and threatened that she should have to "repay" her wages to the Company.

73.     Continuing to target her, on October 19, 2020, Ms. Brown mailed Ms. Oliver a letter claiming that even after her termination, "there is still an ongoing investigation" into Ms. Oliver.

**N.     Male employees were not investigated, disciplined or threatened like Ms. Oliver.**

74.     In contrast to how Ms. Oliver was treated, in 2019 and 2020 male hourly employees including Charles Ford and Jahmal Bailey routinely stayed clocked in while leaving the plant, resulting in them earning wages for time not worked.

75.     Another male exempt employee, Samuel Rogers, routinely was on the premises for fewer than eight hours per day in 2019 and 2020 despite the requirement that he work an eight hour shift each day.

76.     From January to March 2020, in e-mail and in person, Ms. Oliver alerted Drew Scott, Regional Manufacturing Director, Torsten Schultz, Operations Manager, Brandon Cockrell, Maintenance Superintendent and Roger Simmons, Engineering Manager that Samuel Rogers, Charles Ford and Jahmal Bailey were defrauding the company in order to receive wages, and these male employees were never disciplined.

77.     Further, another male employee, Ryant Price, Operator, and the site's union chairman and representative, has been on an extended leave because of a shoulder surgery and back injury. Mr. Price and others posted numerous photographs on Facebook of Mr. Price enjoying time with his family, including traveling and carrying his grandchildren. However, unlike Ms. Oliver, Mr. Price was not terminated, investigated or disciplined in anyway.

**O.     After her termination, Mr. Stillufsen retaliated against Ms. Oliver for complaining of violations of federal and state law.**

78.     On March 12, 2021, counsel for Ms. Oliver informed Roehm in writing that Ms. Oliver's rights under Title VII, disability discrimination and retaliation in violation of the Americans with Disabilities Act, the Rehabilitation Act, the Louisiana Employment Discrimination Law, the Employee Retirement Income Security Act ("ERISA") rights under the Family Medical Leave Act ("FMLA") had been violated.

79.     In response, by telephone, on March 23, 2021, and subsequent letter of March 29, 2021, Mr. Stillufsen continued to retaliate against Ms. Oliver, and instead of responding to her complaints, accused Ms. Oliver of "stealing" from Roehm and threatened to sue her if she pursued her claims against Roehm. The letter stated:

> We have calculated the total amount of overtime and STD payments made to Ms. Oliver in 2019 and 2020 at over $71,000. Rest assured, should your client file suit against Roehm, a counter claim for, at a minimum, these amounts will be brought against Ms. Oliver. She will be required to account for every hour worked for Roehm, and every dollar paid to her by Roehm.

80.     In reality, Ms. Oliver worked all hours assigned to her, only worked overtime when approved to do so, and after working overtime, had all hours approved by her supervisor.

81.     Further, despite Mr. Stillufsen's claim that Ms. Oliver owed Roehm for "STD payments made to Oliver," it was Sedgwick, a third-party, who determined Ms. Oliver was eligible be paid short-term disability pursuant to Roehm's group benefits, based on supporting documentation from her medical providers.

82.     Ms. Oliver filed a Charge of Discrimination alleging disability and gender discrimination, and retaliation, on June 28, 2021.

83.     In September 2021, Mr. Stillufsen submitted a response to the EEOC Charge of discrimination alleging discrimination and retaliation filed by Ms. Oliver. Mr. Stillufsen filled his response with *post hoc* justifications for the failure to give Ms. Oliver tuition reimbursement, or the raises and promotions she requested. For example, for the first time, he claimed suddenly that "Oliver's performance routinely fell below expectations, including a continued inability to collaborate with others, attendance issues, and failures to meet deadlines[.]" However, her supervisors never provided this feedback during her employment, and instead, praised her performance.

84.     In Mr. Stillufsen's EEOC Response, he again threatened to sue Ms. Oliver if she lawfully pursued her claims, although now claiming she had been paid $25,901 in overtime, instead of over $70,000.

85.     Mr. Stillufsen's repeated communications demonstrate, his, and Roehm's attempt to threaten Ms. Oliver and dissuade her from asserting her rights under these important federal statutes.

86.     As a result of Roehm's actions, Ms. Oliver now suffers from anxiety and depression and has suffered economic losses as a result of lost wages and benefits.

87.     Ms. Oliver was replaced by Stephen Fischer, a man who had who had not engaged in protected activity under federal or state law and did not have any disabilities.

## V.     CAUSES OF ACTION

### First Cause of Action
### Family Medical Leave Act, 29 U.S.C. §§ 2601 Et Seq.
### Interference, Denial, and Retaliation
### *(Against all Defendants)*

88.     Plaintiff hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

89.     Plaintiff was an eligible employee as defined by the Family Medical Leave Act ("FMLA")  at all relevant times to this Complaint and was entitled to a total of 12 workweeks of leave during any 12-month period because of "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

90.     Defendants were Plaintiff's "employers" within the meaning of the FMLA as they had over fifty employees within 75 miles. See 29 U.S.C. § 2611(4).

91.     Accordingly, Plaintiff was protected by the FMLA, including protection against interference with and retaliation for the exercise of her rights under the FMLA.

92.     Defendants Brown and Stillfusen acted, directly or indirectly, in the interest of Roehm when interacting with Plaintiff, and exercised independent control over Plaintiff's work situation.

16

93.     The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title … [or] to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title." 29 U.S.C. § 2615.

94.     The FMLA further provides: "When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(B)(1). An employer's failure to provide notice as required constitutes "interference with, restraint, or denial of the exercise of an employee's FMLA rights." 29 C.F.R. § 825.300(E).

95.     Ms. Oliver repeatedly requested FMLA to receive treatment for her disabilities, and while on leave, was terminated.

96.     Defendants did not have a good faith belief or reasonable grounds for violating Plaintiff's rights under the FMLA.

97.     Defendants retaliated against Plaintiff for requesting, and taking, FMLA leave when they subjected her to a hostile work environment, refused to promote her, terminated her, denied her opportunities to work overtime, and threatened to sue her.

98.     Although Ms. Oliver was qualified to be promoted, she was not, and instead, individuals who had not engaged in protected activity were promoted. Further, Ms. Oliver was replaced by individuals who did not engage in protected activity.

99.     As a result of Defendants' unlawful conduct, Plaintiff sustained lost wages, lost benefits, and is entitled to liquidated damages. Defendants did not act in good faith in violating the FMLA.

100.    Defendants are liable for the acts and/or omissions of its agents and employees. Defendants, either directly, or by and through its agents, which directly and proximately caused her severe injuries, damages and losses.

### SECOND CAUSE OF ACTION
### Disability Discrimination In Violation of the
### Louisiana Employment Discrimination Law
### *(Against Defendant Roehm)*

101.    Plaintiff hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

102.    The Louisiana Employment Discrimination Law ("LEDL") provides that "[n]o otherwise qualified person with a disability shall, on the basis of a disability, be subjected to discrimination in employment." La. R.S. § 23:323(A).

103.    LEDL specifically prohibits employers from "discharg[ing] or otherwise discriminat[ing] against an otherwise qualified person with a disability with respect to compensation or the terms, conditions, or privileges of employment on the basis of a disability when it is unrelated to the individual's ability to perform the duties of a particular job or position." La. R.S. § 23:323(B)(2).

104.    At all relevant times, Plaintiff's disabilities described in detail above constituted "physical or mental impairments which substantially limit one or more of her major life activities" as defined by LEDL.

105.    At all pertinent times, Plaintiff performed the duties of her job competently and was more than qualified.

106.    At all times relevant to this action, Defendant was an "employer" as that term is defined by LEDL, and Plaintiff was an "otherwise qualified employee with a disability" entitled

to protection in her employment from discrimination based on her disabilities within the meaning of LEDL.

107.    As described above, Plaintiff was subjected to many adverse employment actions as a result of her disabilities, including but not limited to, subjecting her to a hostile work environment, refusing her tuition reimbursement, failing to promote her, denying her opportunities to work overtime, failing to provide her raises, terminating her from her employment, and threatening to sue her.

108.    Although Ms. Oliver was qualified for promotions, Defendant promoted non-disabled individuals in place of Ms. Oliver.

109.    Defendant intentionally discriminated against Plaintiff because of her disabilities.

110.    Plaintiff was terminated from her employment for no legitimate, non-discriminatory reason, as alleged above, and if not for Plaintiff's disabilities, she would not have been subject to discrimination by Defendant.

111.    Defendant knew or should have known of the unlawful acts and practices alleged above yet failed to act promptly to prevent or end the harassment and discrimination.

112.    Defendant was liable for the acts and/or omissions of its agents and employees. Defendant, either directly, or by and through its agents, which directly and proximately caused Plaintiffs severe injuries, damages, and losses.

113.    As a result of Defendant's misconduct, Plaintiff has suffered and continues to suffer damages, including but not limited to lost wages and emotional damages, and is thus entitled to all damages and remedies available under LEDL pursuant to La. R.S. § 23:303.

114.    Defendant's unlawful and discriminatory conduct in violation of La. R.S. 23:332(A)(1) was outrageous and malicious, was intended to injure plaintiff, and was done with

conscious disregard of plaintiff's civil rights, entitling Plaintiff to an award of attorneys' fees under La. R.S. § 23:303.

**THIRD CAUSE OF ACTION**
**Gender Discrimination In Violation of the**
**Louisiana Employment Discrimination Law**
(***Against Defendant Roehm***)

115.    Plaintiff hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

116.    The Louisiana Employment Discrimination Law ("LEDL") provides that no employer shall not "[i]ntentionally fail or refuse to hire or to discharge any individual, or otherwise to intentionally discriminate against any individual with respect to compensation, or terms, conditions, or privileges of employment, because of the individual's . . . sex[.]" La. Rev. Stat. Ann. § 23:332 *et seq.*

117.    At all pertinent times, Plaintiff performed the duties of her job competently and was more than qualified.

118.    At all times relevant to this action, Defendant was an "employer" as that term is defined by LEDL, and Plaintiff was a qualified employee entitled to protection in her employment from discrimination based on her gender within the meaning of LEDL.

119.    As described above, Plaintiff was subjected to many adverse employment actions as a result of her gender, including but not limited to, subjecting her to a hostile work environment, failing to promote her, failing to reimburse her tuition, denying her opportunities to work overtime, terminating her from her employment and threatening to sue her.

120.    Although Ms. Oliver was qualified for promotions, Defendant promoted male employees in place of Ms. Oliver.

121.    Defendants intentionally discriminated against Plaintiff because of her gender.

122.    Plaintiff was subjected to adverse employment actions for no legitimate, non-discriminatory reason, as alleged above, and if not for Plaintiff's gender, she would not have been subject to discrimination by Defendants.

123.    Defendants knew or should have known of the unlawful acts and practices alleged above yet failed to act promptly to prevent or end the harassment and discrimination.

124.    Defendants are liable for the acts and/or omissions of its agents and employees. Defendant, either directly, or by and through its agents, which directly and proximately caused Plaintiffs severe injuries, damages, and losses.

125.    As a result of Defendants' misconduct, Plaintiff has suffered and continues to suffer damages, including but not limited to lost wages and emotional damages, and is thus entitled to all damages and remedies available under LEDL pursuant to La. R.S. § 23:303.

126.    Defendants' unlawful and discriminatory conduct in violation of La. R.S. 23:332(A)(1) was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of attorneys' fees under La. R.S. § 23:303.

**FOURTH CAUSE OF ACTION**
**Discrimination and Retaliation In Violation of the**
**Louisiana Human Rights Act**
(***Against Defendant Roehm***)

127.    Plaintiff hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

128.    The Louisiana Human Rights Act ("LHRA") is intended to "safeguard all individuals within the state from discrimination because of . . . sex, . . . [and] disability . . . in connection with employment . . . ; to protect their interest in personal dignity and freedom from

humiliation; to make available to the state their full productive capacities in employment . . . ; and to further the interest, rights, and privileges within the state." La. R.S. § 51:2231.

129. The LHRA makes it unlawful for an employer, as defined by LEDL, "[t]o retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this Chapter or by [LEDL]," La. R.S. § 51:2256, and provides civil remedies for "any person deeming himself injured by" such unlawful conduct. La. R.S. § 51:2264.

130. At all times relevant to this action, the LHRA has been in full force and effect and has applied to Defendant's conduct.

131. As set forth above, Defendant discriminated against Plaintiff on the basis of her gender and disabilities in connection with her employment, as prohibited by the LHRA.

132. Defendant retaliated against Plaintiff because of her requests for accommodations, her use of accommodations, her complaints of discrimination and retaliation, and subjected her to a hostile work environment, refused to grant her accommodation requests, failed to promote her, refused to reimbursement her tuition, terminated her employment, and threatened to sue her.

133. Defendant engaged in conduct materially adverse to a reasonable employee and took adverse employment actions against Plaintiff, as heretofore alleged.

134. The adverse actions taken against Plaintiff were in retaliation for engaging in protected activity and were motivated by retaliatory animus.

135. Although Ms. Oliver was qualified to be promoted, she was not, and instead, individuals who had not engaged in protected activity were promoted. Further, Ms. Oliver was replaced by individuals who did not engage in protected activity.

136.    Defendants are liable for the acts and/or omissions of their agents and employees. Defendants, either directly, or by and through their agents, directly and proximately caused Plaintiffs severe injuries, damages, and losses.

137.    As a result of Defendants' retaliation, Plaintiff has suffered and continues to suffer damages, including but not limited to lost wages and emotional damages, and is thus entitled to all damages and remedies available under LEDL and the LHRA.

138.    Defendant's unlawful and retaliatory conduct in violation of La. R.S. 23:332(A)(2) was outrageous and malicious, was intended to injure Plaintiff and was done in conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of attorneys' fees under La. R.S. 23:3030.

### FIFTH CAUSE OF ACTION
### Section 510 of The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140
### (*As Against Defendant Roehm*)

139.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

140.    Plaintiff sought treatment for her knee injury under employee group health insurance, and sought and received short term disability through a policy provided by her employer.

141.    ERISA protects individuals for being retaliated against for exercising their rights under the act, including the right to participate in group health insurance benefits.

142.    Roehm subjected Plaintiff to a hostile work environment, refused her raises, denied her opportunities to work overtime, fired Plaintiff, and threatened to sue her, in retaliation for exercising her rights under ERISA and to prevent attainment of benefits to which she would have become entitled under an employee benefit plan.

143.    Plaintiff was motivated by discriminatory and retaliatory intent.

144.    As a result of Defendant's unlawful actions, Plaintiff was denied benefits owed to her under Roehm's group health insurance and disability related plans, and suffered other damages.

145.    Defendant Roehm is liable for the acts and/or omissions of its agents and employees. Defendant, either directly, or by and through its agents, which directly and proximately caused her severe injuries, damages and losses.

### SIXTH CAUSE OF ACTION
### Intentional Interference with Contract, La. R.S. 2315
### (*As Against Defendants Brown and Stillufsen*)

146.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

147.    Defendants Stillufsen and Brown were corporate officers of Roehm and/or acted with the same ability to influence decisions as a corporate office of Roehm.

148.    As corporate officers, Stillufsen and Brown had a duty not to interfere in Plaintiff's employment relationship with Roehm.

149.    Plaintiff had an employment relationship with Roehm that was a legally protected interest.

150.    Stillufsen and Brown had knowledge of the employment relationship between Roehm and Plaintiff.

151.    Stillufsen and Brown intentionally induced and caused Roehm to terminate Plaintiff's employment

152.    There was no justification for Stillufsen and Brown's wrongful actions in causing Roehm to terminate Plaintiff.

153.    Stillufsen and Brown maliciously and improperly influenced Roehm to terminate plaintiff.

154.     Defendants Stillufsen and Brown conspired to commit an intentional or willful act as described herein, and are liable in solido, with each other, for the damage caused by such act La. R.S. 2324.

155.     Defendants' actions caused Plaintiff damages including lost wages and benefits among other damages.

## SEVENTH CAUSE OF ACTION
### Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, et seq.
### (*As Against Defendant Roehm*)

156.      Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

157.     Defendant engaged in unfair or deceptive acts or practices in the conduct of commerce when it promised Plaintiff protected time off, then fired her for receiving treatment for knee injury before that time expired.

158.     Defendant's conduct offends established Louisiana public policy and further is immoral, unethical, oppressive, unscrupulous, egregious, and/or substantially injurious.

159.     Defendant's unlawful actions should be halted and Defendant should be sanctioned.

160.     Defendants Stillufsen and Brown conspired to commit an intentional or willful act as described herein, and are liable in solido, with each other, for the damage caused by such act La. R.S. 2324.

161.     Defendant caused Plaintiff damages, including actual damages of lost wages and benefits, and loss of goodwill.

162.     Defendant is liable for treble damages for these violations.

163.     Defendant Roehm is liable for the acts and/or omissions of its agents and employees. Defendant, either directly, or by and through its agents, which directly and proximately caused her severe injuries, damages and losses.

**EIGHTH CAUSE OF ACTION**
**Intentional Inflection of Emotional Distress under Louisiana Law**
(***Against all Defendants***)

164.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

165.     Defendants' conduct, by, among other things, terminating Plaintiff while recovering knee surgery after promising her protected leave, and then repeatedly threatening to sue her, was extreme and outrageous.

166.     The emotional distress suffered by the Plaintiff was severe.

167.     Defendants desired to inflict severe emotional distress, or knew that severe emotional distress would be certain, or substantially certain, to result from their conduct.

168.     Plaintiff's status as an employee entitled her to a greater degree of protection from Defendants.

169.     Defendants Stillufsen and Brown conspired to commit an intentional or willful act as described herein, and are liable in solido, with each other, for the damage caused by such act La. R.S. 2324.

170.     As a result of Defendants' unlawful actions, Plaintiff suffered damages including emotional distress necessitating medical treatment.

171.     Defendant Roehm is liable for the acts and/or omissions of its agents and employees. Defendant, either directly, or by and through its agents, which directly and proximately caused her severe injuries, damages and losses.

## VI.    RELIEF REQUESTED

172.    WHEREFORE, Plaintiff requests judgment be entered against Defendants and that the Court grant the following:

173.    Declaratory relief;

174.    Injunctive relief including but not limited to reinstatement;

175.    Judgment against Defendants for Plaintiffs' asserted causes of action;

176.    Damages in such an amount as shall be proven at trial for back-pay and damages including lost benefits, wages, promotions, tenure, seniority, lost promotions, and other employment opportunities;

177.    Award of compensatory damages including for emotional distress;

178.    An order for the Defendant to reinstate Plaintiff or in the alternative to pay for front-pay and benefits;

179.    Punitive damages;

180.    Award of treble damages;

181.    Award of liquidated damages;

182.    Award costs and attorney's fees;

183.    Pre- and post-judgement interest; and

184.    Order such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 5th day of October, 2021

Respectfully submitted,

/s/ Casey Denson
**Casey Rose Denson (La. Bar #33363)**

27

**Mercedes Townsend (La. Bar #39540)**
**CASEY DENSON LAW, LLC**
4601 Dryades Street
New Orleans, LA 70115
Phone: (504) 224-0110
Fax: (504) 534-3380
cdenson@caseydensonlaw.com
mtownsend@caseydensonlaw.com